



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 24, 2019**

**United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 16-40514-MXM |
| DAMON CORNELIUS SULLIVAN AND | § | |
| KATRACY LAHI SULLIVAN, | § | |
| | § | CHAPTER 13 |
| DEBTORS. | § | |

### MEMORANDUM OPINION AND ORDER DENYING TRUSTEE'S MODIFICATION OF CHAPTER 13 PLAN AFTER CONFIRMATION
*[RELATES TO ECF 54]*

Before the Court is the *Trustee's Modification of Chapter 13 Plan after Confirmation (Increased Gross Income)* (the "**Plan Modification**")[1] filed by Pam Bassel, Standing Chapter 13 Trustee (the "**Trustee**").  The Trustee's Plan Modification seeks to modify the Chapter 13 Plan[2] filed by Damon and Katracy Sullivan (the "**Debtors**") to include funds that the Debtors withdrew

---

[1] ECF No. 54.

[2] *Debtor's(s') Chapter 13 Plan and Motion for Valuation* [ECF No. 14] (the "**Plan**").  The Plan was confirmed on May 26, 2016 [ECF No. 34] and the order confirming the Plan was amended on June 6, 2016.  *See Amended Order Confirming Chapter 13 Plan, Valuing Collateral; Allowing Debtor's Attorney's Fees; Providing for a Trustee's Recommendation Concerning Claims and Other Related Matters (With Revisions to the Plan as Specified Herein)* [ECF No. 35].

from their exempt retirement accounts after the petition date. The Debtors filed an Objection[3] to the Plan Modification. After considering the Plan Modification, the Objection, the Trustee's oral modification to the Plan Modification—proposed at the hearing— (the "***Oral Plan Modification***"), the Trustee's Brief,[4] the Debtors' Brief,[5] the Trustee's Reply Brief,[6] the testimony of Mr. Sullivan, exhibits admitted into evidence, and the arguments of counsel, the Court finds and concludes that the Plan Modification and the Oral Plan Modification should be denied.

## I.    OVERVIEW

Unforeseen and unanticipated life events frequently cause Chapter 13 debtors to incur material unbudgeted post-petition expenses. Usually debtors in that predicament seek to modify their plans under § 1329 or seek some other form of relief from the court to address such expenses, but other debtors face the unenviable choice between making their Chapter 13 plan payment or using their available cash to pay the unexpected post-petition expenses. The cash-strapped debtors who choose to pay their post-petition expenses often default under their plans and risk possible dismissal of their Chapter 13 cases.

In this case, the Debtors incurred unexpected medical and home-repair expenses, but they had another potential option to address those expenses – the availability of funds in their exempt retirement plans. The Debtors believed they could use the funds in their exempt retirement plans to pay the unexpected expenses outside of their confirmed plan. Therefore, the Debtors unilaterally withdrew all of the available funds in their exempt retirement plans and paid the medical and

---

[3] *Debtor's Response in Opposition to Trustee's Modification of Chapter 13 Plan after Confirmation* [ECF No. 56] (the "***Objection***").

[4] *Trustee's Brief in Support of Trustee's Plan Modification* [ECF No. 63] (the "***Trustee's Brief***").

[5] *Brief in Support of Debtor's Response in Opposition to Trustee's Modification of Chapter 13 Plan After Confirmation* and supplemental documents [ECF Nos. 69 and 70] (the "***Debtors' Brief***").

[6] *Reply to Brief in Support of Debtors' Response in Opposition to Trustee's Modification of Chapter 13 Plan after Confirmation* [ECF No. 73] (the "***Trustee's Reply Brief***").

home-repair expenses directly. Unfortunately, they did so without consulting their attorneys, notifying the Trustee, or obtaining prior court approval.

The Trustee eventually discovered that the Debtors had withdrawn the funds from their exempt retirement plans, so the Trustee filed the Plan Modification under § 1329, which triggered several questions and disputes, including the impact, if any, the distribution had on the exempt status of such funds. Specifically, the Trustee argued that the exempt retirement funds lost their exempt status and became property of the estate under § 1306, thereby requiring such funds to be paid to the Trustee to increase the Debtors' Plan Base for the benefit of the pre-petition unsecured creditors. In response, the Debtors argued that the distribution of the exempt retirement funds did not affect their exempt status and that they could use their exempt retirement funds as they saw fit. Although the resolution of this dispute appears, at first blush, to be limited and straightforward, the facts in this case produced several procedural and legal implications beyond the exemption issue.

## II.    FACTS

On February 1, 2016, the Debtors filed their *Chapter 13 Petition.*[7] On February 12, 2016, the Debtors filed their *Schedules.*[8] On *Schedule B,* the Debtors listed their two retirement accounts.[9] The first account was a 401k Plan valued at $10,293.61, and the second account was a Thrift Savings Plan valued at $42,335.48 (the 401k Plan and the Thrift Savings Plan, together, the

---

[7] ECF No. 1.

[8] ECF No. 10. After the hearing, the Debtors filed amended *Schedules A/B* and *C* at ECF No. 72. The Debtors amended *Schedule C* to correct, in part, the claimed exemptions for the retirement accounts from § 522(d)(10)(E) to §§ 522(d)(12) and if necessary 522(d)(5). Both the Debtors and the Trustee agree that the Debtors' post-hearing amendment to *Schedule C* does not alter or affect their positions or arguments regarding the issues currently before the Court.

[9] ECF No. 10.

"***Retirement Plans***").[10] On *Schedule C,* the Debtors sought to exempt the funds in the Retirement Plans in the total amount of $52,629.09 (the "***Exempt Retirement Funds***") using the federal exemptions under 11 U.S.C. § 522(d)(12).[11] Neither the Trustee nor any other party-in-interest objected to the Debtors' claimed exemption. As a result, the Exempt Retirement Funds became the Debtors' exempt property.

At the hearing, Mr. Sullivan testified credibly that during 2017, he was diagnosed with congestive heart failure, which caused the Debtors to incur substantial out-of-pocket medical expenses and forced Mr. Sullivan to take early retirement, resulting in a 40% decrease in the Debtors' post-petition monthly disposable income. Mr. Sullivan further testified credibly that during 2017, the Debtors' house sustained damage to the roof, water damage to its interior, and damage to the air conditioning unit—all of which resulted in substantial and unbudgeted post-petition out-of-pocket repair costs. The Court finds and concludes that all of the unexpected and unbudgeted post-petition medical and home-repair expenditures were reasonably necessary for the maintenance or support of the Debtors and their dependents.

Rather than (i) seeking advice from their attorneys, (ii) seeking the Trustee's prior consent, (iii) filing a proposed plan modification, or (iv) seeking any form of prior Court approval, the Debtors unilaterally withdrew the entire balance[12] of available funds in the Retirement Plans and

---

[10] *Id.*

[11] *Id.* The Debtors did not check the box on *Schedule C* to claim "100% fair market value, up to any applicable statutory limit" for the funds in either of the Retirement Plans. *See* ECF Nos. 10 and 72. Therefore, in the alternative, the Trustee also argued that because the Debtors did not check the box to trigger the Schwab Option, the amount of the Gross Distribution in excess of Exempt Retirement Funds was not claimed as exempt and, at a minimum, such amount should be paid to the Trustee. Because the Court denies the proposed plan modifications on other grounds, the Court need not address the Schwab Option issue.

[12] As a result of the distribution (the "***Gross Distribution***"), the Debtors incurred taxable income of $71,927. *See* Debtors' Ex. C (2017 Tax Return, line 16b [Income from Pensions and annuities]). From the Gross Distribution, $7,814 was applied directly to pay off the Debtors' outstanding 401k loan from the 401k Plan. *See* Debtors' Ex. F at 3. Of the remaining $64,113 balance, 20% was withheld for federal taxes and penalties (approximately $12,800), leaving a balance of approximately $51,000 (the "***Net Distribution Proceeds***"), which was paid to the Debtors.

used the Net Distribution Proceeds to pay the post-petition medical and home-repair expenses directly. Although the Debtors should have known better, Mr. Sullivan testified credibly that they did not know or realize that they should not access the Exempt Retirement Funds to pay the medical and home-repair expenses without first notifying the Trustee and seeking prior Court approval. Mr. Sullivan also testified that the Debtors did not roll over any of the Gross Distribution to another qualified retirement plan within sixty days of the distribution, thereby incurring the resulting federal income tax liability in 2017.

On or about April 7, 2018, the Debtors filed their 2017 Federal Income Tax Return (the "*2017 Tax Return*") reflecting total adjusted gross income of $178,869, including $71,927 of taxable income resulting from the Gross Distribution.[13] In compliance with this District's Standing Order,[14] the Debtors provided a copy of their 2017 Tax Return to the Trustee. Following the Trustee's receipt of the 2017 Tax Return and based on the *appearance* of a substantial increase in the Debtors' income reflected in the 2017 Tax Return, the Trustee filed the Plan Modification, seeking to increase the Debtors' Plan Base from $70,306.00 to $166,008.90 by increasing the Debtors' monthly plan payments from $1,166.00 per month to $4,046.00 per month for the remaining thirty-one months of the Plan.

Following the filing of the Plan Modification, the Debtors amended their *Schedules I and J*[15] and provided the Trustee with updated payroll records to reflect, in part, the Debtors' reduced post-petition income caused by Mr. Sullivan's medically forced early retirement. Based on such additional information and evidence admitted during the hearing, the Trustee made the proposed

---

[13] Debtors' Ex. C.

[14] *See Standing Order Concerning all Chapter 13 Cases*, General Order 2017-01 dated June 24, 2017 (the "*Standing Order*").

[15] ECF No. 60; Debtors' Ex. D.

Oral Plan Modification, in the alternative, to request that the Debtors be required to make a lump-sum payment of $71,927 (the Gross Distribution) to the Trustee. The Trustee argued that such funds lost their exempt status and constitute non-exempt property of the Debtors' bankruptcy estate pursuant to § 1306, thereby justifying a corresponding increase in the Debtors' Plan Base for the benefit of pre-petition unsecured creditors.

Although the parties focused their argument and briefing primarily on the impact, if any, the distribution had on the exempt status of the Exempt Retirement Funds, the Court must ultimately answer the following two questions: (i) does the Plan Modification or the Oral Plan Modification satisfy the requirements of § 1329; and if so, (ii) in exercising its discretion, should the Court approve either such modification? The short answer to both questions is "no."

### III. ANALYSIS

**A. The Plan Modification and the Oral Plan Modification are not feasible as required by § 1329.**

Based on the *appearance* of a substantial increase in the Debtors' post-petition income reflected in the 2017 Tax Return, the Trustee had a good-faith basis for filing the Plan Modification. Even though the Trustee had a good-faith basis to file the Plan Modification, the Court must determine if that modification or the Oral Plan Modification satisfies the mandatory requirements for approval under § 1329. If either modification does, then the Court must still exercise its discretion to determine if the modification should be approved.[16]

Section 1329(a) permits plan modification for four given purposes, one of which is "to increase or reduce the amount of payments on claims of a particular class provided for by the plan."[17] Both proposed plan modifications satisfy § 1329(a). Although the Plan Modification and

---

[16] *See In re McAllister,* 510 B.R. 409, 412 (Bankr. N.D. Ga. 2014).

[17] 11 U.S.C. § 1329(a)(1).

the Oral Plan Modification satisfy § 1329(a), the modifications must also satisfy § 1329(b) and (c). Section 1329(b)(1) provides, in relevant part, that "section 1325(a) . . . [applies] to any modification under subsection (a) of this section."[18] And § 1325(a)(6) requires the Court to find that "the debtor will be able to make all payments under the plan and to comply with the plan."[19]

### 1. *The Plan Modification seeking increased monthly plan payments is not feasible.*

The uncontroverted evidence and credible testimony of Mr. Sullivan established that (i) the substantial increase in the Debtors' 2017 taxable income was based solely on the distribution of the available funds from their Retirement Plans, and (ii) the Debtors have not received and do not receive increased post-petition monthly disposable income that would enable them to pay the substantial increase in plan payments sought by the Plan Modification. Further, the Trustee offered no evidence to establish that the Debtors had the ability to make the increased plan payments sought by the Plan Modification. Based on the uncontroverted evidence, the Court finds and concludes that the Trustee failed to satisfy her burden to establish that the Plan Modification (to increase the Debtors' monthly plan payments) is feasible as required by §§ 1329(b)(1) and 1325(a)(6).[20] Therefore, the Plan Modification is denied.[21]

---

[18] 11 U.S.C. § 1329(b)(1).

[19] 11 U.S.C. § 1325(a)(6).

[20] *See In re Zavala*, 366 B.R. 643, 655 (Bankr. W.D. Tex. 2007).

[21] To be clear, by finding that the Plan Modification is not feasible, the Court does not condone the Debtors' ill-advised spending of the retirement funds which caused the Plan Modification to fail. Such actions could have resulted in other adverse consequences for the Debtors, including, but not limited to, their bankruptcy case being dismissed for cause under § 1307(c)(6).

### 2. *The Oral Plan Modification seeking lump-sum payment of the Gross Distribution is not feasible.*

The Trustee also requests, as an alternative, that the Oral Plan Modification be approved to require the Debtors to make a lump-sum payment of $71,927 (the Gross Distribution)[22] to the Trustee. The Trustee asserts that the Exempt Retirement Funds lost their exempt status when they were distributed and became non-exempt property of the Debtors' bankruptcy estate pursuant to § 1306, thereby justifying a corresponding increase in the Plan Base for the benefit of pre-petition unsecured creditors.

Even if the Trustee's position is correct, the uncontroverted evidence and credible testimony of Mr. Sullivan confirm that the entire balance of the Gross Distribution has long since been spent[23] and is no longer available to the Debtors to pay the requested lump-sum payment to the Trustee. Furthermore, the Trustee offered no evidence that the Debtors had sufficient other funds to make the proposed lump-sum payment. Based on the uncontroverted evidence, the Court finds and concludes that the Trustee did not satisfy her burden to establish that the Oral Plan Modification (to require the Debtors to make a lump-sum payment to the Trustee in the amount of $71,927) is feasible as required by § 1329(b)(1).[24] Therefore, the Oral Plan Modification is denied.[25]

Because the Plan Modification and the Oral Plan Modification are denied due to lack of feasibility, arguably the Court's work is finished. Concluding the ruling at this point, however,

---

[22] In the alternative, the Trustee requested that the Debtors make a lump-sum payment of $19,297.91 based on the Trustee's Schwab Option argument. *See supra* note 11.

[23] The entire balance of the Gross Distribution was used to pay the following: (i) the outstanding balance of the Debtors' corresponding 401k loan in the amount of $7,814, (ii) federal income taxes and penalties incurred as a result of the distribution in the approximate amount of $12,800, and (iii) the medical and home-repair expenses that triggered the Debtors' decision to withdraw funds from the Retirement Plans.

[24] *See In re Zavala*, 366 B.R. at 655.

[25] *See supra* note 21.

would leave unresolved significant underlying issues and disputes raised by the parties during the hearing and in their post-hearing briefs. Therefore, the Court will address those issues and disputes.

**B. The distributed Exempt Retirement Funds lost their exempt status, and the Gross Distribution became non-exempt property of the Debtors' bankruptcy estate pursuant to § 1306.**

The Debtors opted to exempt the funds in the Retirement Plans under § 522(d)(12).[26] There is no dispute that the Exempt Retirement Funds were the Debtors' exempt property. There is also no dispute that the Debtors did not roll over any of the Gross Distribution into another qualified plan within sixty days of the distribution.

Even though the Debtors did not roll over the Gross Distribution into another qualified plan, the Debtors assert that the distributed funds remained their exempt property under § 522(d)(12) to use as they saw fit. The Trustee, on the other hand, argues that the distributed funds lost their exempt status protection after such funds were distributed to the Debtors and became non-exempt property of the Debtors' bankruptcy estate pursuant to § 1306(a)(1).[27] To determine

---

[26] 11 U.S.C. § 522(d)(12) provides:

> (d) The following property may be exempted under subsection (b)(2) of this section: . . .
>
>> (12) Retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986.

Debtors utilizing the federal exemptions apparently may elect to exempt eligible retirement funds under either 11 U.S.C. §§ 522(d)(12) or 522(b)(3)(C). The language regarding eligible retirement funds contained in both subsections of § 522 is identical. In addition, § 522(b)(4) specifically applies to both §§ 522(d)(12) and 522(b)(3)(C).

[27] 11 U.S.C. § 1306(a)(1) provides:

> (a) Property of the estate includes, in addition to the property specified in section 541 of this title –
>
>> (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

the effect, if any, the distribution had on the exempt status of the 401k Funds, the Court must analyze the federal exemption statute.

The Debtors, however, did not cite any authority addressing the federal exemption statutes. Rather, the Debtors rely on several cases analyzing the Texas exemption statutes and argue that such cases should be persuasive when analyzing § 522(d)(12). The Court disagrees. Although there may be similarities between § 522(d)(12) and the Texas exemption statute, each statute must be fully analyzed and applied independently.

A fundamental rule of statutory construction requires courts to give effect to every word, clause, and provision in a given statute so that no part of the statute would be rendered insignificant, inoperative, or superfluous.[28] Therefore, when analyzing a debtor's exemption under § 522(d)(12), the Court must analyze and apply the entirety of § 522.

In this case, the source of the exemption dispute revolves around the *distribution* of the Exempt Retirement Funds to the Debtors. Sections 522(b)(4)(C) and (D)[29] specifically address the impact that a *distribution* of retirement funds may have on their exempt status. And both subsections expressly apply to § 522(d)(12).[30]

---

[28] *See Duncan v. Walker*, 533 U.S. 167, 174 (2001).

[29] 11 U.S.C. §§ 522(b)(4)(C) and (D) provide, in pertinent part:

> (4) For purposes of . . . subsection (d)(12), the following shall apply: . . .
>
>> (C) A direct transfer of retirement funds from 1 fund or account that is exempt from taxation . . . shall not cease to qualify for exemption under . . . subsection (d)(12) by reason of such direct transfer.
>>
>> (D)(i) Any distribution that qualifies as an eligible rollover distribution within the meaning of section 402(c) of the Internal Revenue Code of 1986 . . . shall not cease to qualify for exemption under . . . subsection (d)(12) by reason of such distribution.
>>
>> (ii) A distribution described in this clause is an amount that – (I) has been distributed from a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986; and (II) to the extent allowed by law, is deposited in such a fund or account not later than 60 days after the distribution of such amount.

[30] *Id.*

Sections 522(b)(4)(C) and (D) provide that exempt retirement funds that are (i) directly transferred from one eligible fund to another eligible fund,[31] or (ii) *distributed* from an eligible fund and then subsequently rolled over and deposited into another eligible fund within sixty days after the *distribution* do not "cease to qualify for exemption under . . . subsection (d)(12) by reason of such distribution."[32]  Applying § 522(b)(4)(D)(ii) in context and in its place in the overall statutory scheme, it is apparent that under federal law, Congress intended to extend the exemption protection to distributions only to the extent such distributions are deposited into another eligible fund within sixty days after such a distribution.[33]  If the funds are not deposited into another eligible fund within sixty days after distribution, the exemption protection ceases.[34]

In this case, there is no dispute that the Gross Distribution was not rolled over into an eligible fund within sixty days as required by § 522(b)(4)(D)(ii).  Therefore, the Exempt Retirement Funds lost their exempt status and the Gross Distribution became property of the bankruptcy estate under § 1306(a)(1).  As noted below, however, even though the Exempt Retirement Funds lost their exempt status and became property of the bankruptcy estate under § 1306(a)(1), the Court still denies both proposed modifications.

**C.     Even if the Plan Modification or the Oral Plan Modification were feasible, in exercising its discretion, the Court denies both modifications.**

Section 1329(a) provides that a plan *may* be modified.[35]  Accordingly, if a modification meets all of the requirements of § 1329, the Court still has discretion to approve or deny the

---

[31] 11 U.S.C. § 522(b)(4)(C).

[32] 11 U.S.C. § 522(b)(4)(D)(i) and (ii).

[33] *Id.  Accord In re Patrick,* 411 B.R. 659, 666 (Bankr. C.D. Cal. 2008) ("As long as a distribution complies with § 402(c) [of the Internal Revenue Code] (and qualifies for exemption from taxation under that subsection) or is 'rolled over' into another retirement account within 60 days, it is exempt from the bankruptcy estate.").

[34] *In re Patrick,* 411 B.R. at 665-66.

[35] *See* 11 U.S.C. § 1329(a).

modification.[36] Although § 1329 does not provide standards to guide courts in the exercise of their discretion, courts have held that a proposed modification should be "viewed in light of all the circumstances"[37] and upon consideration "of the two fundamental concepts of a fresh start for debtors and fairness to creditors."[38]

Given Mr. Sullivan's age, medical condition, and reduced ability to work, it is clear to the Court that the Debtors had a good-faith basis to use their Exempt Retirement Funds to pay the unexpected and unbudgeted medical and home-repair bills. Had Mr. Sullivan not suffered his medical setback and the Debtors not endured damage to their home, then the Debtors would not have had a reason to withdraw the Exempt Retirement Funds from the Retirement Plans and such funds would have remained the Debtors' exempt asset, outside the reach of pre-petition creditors' claims.

Finally, even though the Debtors made the imprudent unilateral decision to spend the non-exempt proceeds from their Exempt Retirement Funds to pay the medical and home-repair expenses in violation of their confirmed Plan,[39] the Court finds and concludes that the Debtors' actions were not made in bad faith or in reckless disregard of their obligations under the Bankruptcy Code, their Plan, or any other orders of the Court. With that said, the Debtors took a risk when they spent the non-exempt proceeds without first obtaining Court approval. Their decision could have resulted in severe adverse consequences, including the dismissal of their

---

[36] *See In re McAllister,* 510 B.R. at 430.

[37] *Id.* at 431; *see also In re Forte*, 341 B.R. 859, 870 (Bankr. N.D. Ill. 2005) ("[T]he determination of a motion under § 1329 . . . properly depends on the fairness of the proposed modification, viewed in light of all the circumstances."); *In re Burgie*, 239 B.R. 406, 409 (9th Cir. BAP 1999) ("[A] motion by a trustee to modify a chapter 13 plan is subject to the bankruptcy judge's discretion and good judgment.").

[38] *See In re McAllister*, 510 B.R. at 431; *In re Forte*, 341 B.R. at 869.

[39] The Plan provides that: "Debtors shall not dispose of . . . any non-exempt property . . . prior to discharge, without consent of the Trustee or order of the Court after notice to the Trustee and all creditors." ECF No. 14. As noted in footnote 21, the Debtors' actions could have resulted in the dismissal of their bankruptcy case under § 1307.

bankruptcy case. Fortunately for the Debtors, based on the facts and circumstances in this case, the Debtors will not suffer such adverse consequences for their actions.

Based on the totality of the relevant facts and circumstances in this case and considering the concepts of a fresh start for the Debtors and fairness to their creditors, the Court finds and concludes, in the exercise of its discretion, that it is not appropriate to approve the Plan Modification or the Oral Plan Modification even if such modifications had satisfied the requirements of § 1329. Therefore, the Plan Modification and the Oral Plan Modification are hereby denied.

### IV.    CONCLUSION

For the reasons set forth above, the Court concludes that the Plan Modification and the Oral plan Modification do not satisfy the requirements of § 1329. Alternatively, even had those modifications complied with the requirements of § 1329, the Court, in the exercise of its discretion, declines to approve either modification.

For all of the reasons stated above, it is therefore **ORDERED** that the Plan Modification and the Oral Plan Modification are **DENIED.**

### ### END OF ORDER ###